## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

FILED

OCT 1 5 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CAROLYN SHANNON, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) |
| | ) |
| MIKE HALEY, *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

Civil Action No. CV-02-S-2826-NE

ꟼ𝔦𝔱

05.15 2004

### MEMORANDUM OPINION

This action is before the court on defendants' motion for summary judgment[1]
and plaintiff's motion to strike certain exhibits offered by defendants in support of
their motion.[2] Upon consideration of the motions, briefs,[3] and evidentiary materials,[4]
the court concludes defendants' motion for summary judgment should be granted and
plaintiff's motion to strike denied.

### I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides, in part, that summary judgment
not only is proper, but also that it "*shall be* rendered *forthwith* if the pleadings,

---

[1]Doc. no. 8.

[2]Doc. no. 27.

[3]Doc. no. 15 (defendants' substituted brief in support of motion for summary judgment); doc.
no. 25 (plaintiff's brief in response to motion for summary judgment).

[4]Doc. no. 16 (defendants' substituted evidentiary submissions); doc. no. 23 (plaintiff's
evidentiary submission).



depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)

(emphasis supplied). Thus, "the plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a

party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed.

2d 265 (1986).

> In making this determination, the court must review all evidence and
> make all reasonable inferences in favor of the party opposing summary
> judgment.
>
> The mere existence of some factual dispute will not defeat
> summary judgment unless that factual dispute is material to an issue
> affecting the outcome of the case. The relevant rules of substantive law
> dictate the materiality of a disputed fact. A genuine issue of material
> fact does not exist unless there is sufficient evidence favoring the
> nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting

*Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v.*

*Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). The

motion pierces the pleadings, and "strikes at the heart of the claim. In effect it argues

that as a matter of law upon admitted or established facts the moving party is entitled to prevail." Charles Alan Wright, *The Law of Federal Courts* § 99, at 705 (5th ed. 1994).

## II. FACTUAL BACKGROUND

Plaintiff, Carolyn Shannon, was employed by defendant Alabama Department of Corrections ("ADOC") during three, discrete periods. As explained more fully in the following pages, plaintiff's claims in the present action concern events that occurred during her last stint of employment, but implicate claims that arose during the middle period — claims which were the basis of a previous suit in this court.

### A.    First Period of Employment

Plaintiff's first period of employment with ADOC was brief: it began on July 1, 1985, and ended just thirty days later. Plaintiff was forced to resign as the result of an injury she sustained while undergoing training at the Alabama Corrections Academy, but she resigned with the understanding that she could resume her training following recovery from her injury.[5]

### B.    Second Period of Employment

Plaintiff's recovery apparently was prolonged, because her middle period of

---

[5]Doc. no. 16 (defendants' substituted evidentiary submission), Exhibit 1 (Deposition of Carolyn Shannon), at 39-41.

employment with ADOC began fully three years later, on August 8, 1988.[6]  Once again, plaintiff began as a trainee at the Corrections Academy and, upon completion of her instruction during October of 1988, she was assigned to the Limestone Correctional Facility.[7]  She was promoted to the position of "Correctional Officer I" on February 25, 1989.  That employment was involuntarily terminated six years later, on May 5, 1995.[8]

### 1.    Plaintiff's prior federal court action

Plaintiff filed suit against ADOC in this court on June 26, 1997 ("the 1997 suit"),[9] claiming that during the course of her employment at the Limestone Correctional Facility she was discriminated against on the basis of her sex, subjected to sexual harassment, and retaliated against for complaining about such discrimination.[10]

Bettina Carter, who is central to plaintiff's claims in the present action, held the rank of Sergeant during plaintiff's 1988-1995 term of employment at Limestone Correctional Facility.  Then-Sergeant Carter gave deposition testimony in connection

---

[6]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 2 (Work History Card of Carolyn Shannon).

[7]*Id.*

[8]*Id.*

[9]*See* doc. no. 23 (plaintiff's evidentiary submission), at Exhibit H (complaint in Civil Action No. CV-97-S-1563-NE).

[10]*Id.*

with plaintiff's 1997 suit.[11] Plaintiff testified that Carter's deposition "hurt" her 1997 suit, but upon being pressed to explain the basis for that opinion, plaintiff could not recall the substance of Carter's prior testimony.[12]

### 2. Settlement of the prior action and plaintiff's reinstatement

Plaintiff and ADOC negotiated a settlement of the 1997 suit on April 15, 1999.[13] Pursuant to the terms of agreement, plaintiff was reinstated to her position as a Correctional Officer on April 24, 1999, thus beginning plaintiff's final period of employment with ADOC.[14]

### C. Third Period of Employment

Following reinstatement, plaintiff was assigned to work at ADOC's Decatur Work Release Facility ("the Decatur facility"), where she was supervised by Bettina Carter, who by then had been promoted to the rank of Captain.[15] Plaintiff testified that Captain Carter had substantial input into the decision to assign plaintiff to the Decatur facility following her reinstatement.[16]

When plaintiff began working at the Decatur facility, the Warden of that

---

[11]Shannon Deposition, at 95-97; Carter Deposition, at 12-14.

[12]Shannon Deposition, at 97.

[13]*See* doc. no. 22 (Affidavit of Carolyn Shannon), at ¶ 4.

[14]*Id.* at ¶¶ 4-5.

[15]*Id.* at ¶¶ 5, 7. Bettina Carter was promoted to the position of captain in 1997. *See* doc. no. 23 (plaintiff's evidentiary submission), Exhibit D (Deposition of Bettina Carter), at 10.

[16]Shannon Deposition, at 90-91.

facility was C.I. Hadley.[17]  Hadley often was absent due to vacation leave, and in his

absence Captain Carter (who was the next highest ranking officer) served as *de facto*

Warden of the Decatur facility.[18]  Carter was promoted to the position of Warden in

December of 2001, following Hadley's transfer to another facility.[19]

Carter testified during deposition in the present action that plaintiff "was a

good officer and would be an asset to us," and that she (Carter) "had no problems

with [plaintiff] coming to work" at the Decatur facility.[20]  Plaintiff, however, clearly

did not want to work *for Carter* at the Decatur facility, because she was convinced

she "would be fired from the Department of Corrections no sooner than [she] got

there."[21]  Plaintiff made numerous *oral* requests for transfer to a different facility,[22]

but never filed a *written* request, despite her knowledge that such requests normally

---

[17]Shannon Affidavit, at ¶ 7; doc. no. 16 (defendant's substituted evidentiary submission), at Exhibit 16 (indicating Hadley's first name as "C.I.").

[18]Doc. no. 23 (plaintiff's evidentiary submission), Exhibit D (Deposition of Bettina Carter), at 18-20.  The chain of command for ADOC employees is as follows: Sergeants supervise Correctional Officers; Lieutenants supervise Sergeants; and Captains supervise Lieutenants. Wardens are in charge of an entire correctional facility, and they supervise all inferior officers, including captains.  From 1990 to 1995, Carter served as a Sergeant at the Limestone Facility.  She may have directly supervised plaintiff during this time.  When asked whether she had "supervisory responsibility" over plaintiff, Carter stated "If I was assigned — if she was on my case load per se. There were more than one sergeant per shift."  Doc. no. 23 (plaintiff's evidentiary submission), at Exhibit D (Deposition of Bettina Carter), 8-12.  Carter did issue a performance rating for plaintiff in 1994.  Shannon Deposition, at 58.

[19]Shannon Affidavit, at ¶ 7.

[20]Carter Deposition, at 14.

[21]Shannon Deposition, at 92.

[22]*Id.* at 43-44.

-6-

are made in writing.[23]

### 1.    Comments made to plaintiff following reinstatement

Following plaintiff's reinstatement, Carter told her "you may have gotten your job back but you will not keep it."[24]  According to plaintiff, an unidentified male "officer" at the Decatur facility also said:

> We didn't want you here in the first place.  Nobody wanted you to come over here . . . .  We don't know how you got over here, but we know you're not wanted.  You didn't come over here the way you should have, and it's all because of that damn lawsuit that you had.[25]

Carter and the unidentified "officer" made these comments within two weeks of plaintiff's assignment to the Decatur facility.[26]

### 2.    Plaintiff's employment evaluations

Throughout her employment, plaintiff received annual written performance evaluations.  The appraisals included a "Work Habit Rating" based on attendance, punctuality, cooperation with co-workers, and compliance with ADOC rules. ADOC employees also were given a "Task/Responsibility Rating," which is a composite of ratings (on a numerical scale of 0 to 4) in ten categories related to the employee's performance of assigned job duties.  The Work Habit and Task/Responsibility

---

[23]*Id.* at 45-46.

[24]Shannon Affidavit, at ¶ 8.

[25]Shannon Deposition, at 101.

[26]*See* Shannon Affidavit, at ¶ 8; Shannon Deposition, at 101-102.

Ratings are combined to determine an employee's final, annual Performance Appraisal Score ("PAS score"). The PAS score is categorized in one of the following ranks: "Does Not Meet Standards" (5.4 or less); "Partially Meets Standards" (5.5 to 14.9); "Meets Standards" (15.0 to 24.9); "Exceeds Standards" (25.0 to 34.4); or "Consistently Exceeds Standards" (34.5 or higher).[27]

In 1990 and 1991, while plaintiff was employed as a Correctional Officer at the Limestone Facility, her rating supervisor (Lieutenant *Eddie* Carter) gave her a PAS score of 19.5, or "Meets Standards."[28] In 1992, he assigned her a PAS score of 24.0, "Meets Standards";[29] and in 1993, he gave her 27.0, "Exceeds Standards."[30] In 1994, *Bettina* Carter, who had become plaintiff's rating supervisor sometime during the year, also gave plaintiff a PAS score of 27.0, or "Exceeds Standards."[31] Plaintiff did not receive a PAS score during the years 1995-1998, following her 1995 termination and during the pendency of her prior suit.

---

[27]*See* doc. no. 16 (defendants' substituted evidentiary submission), at Exhibits 4-12 (Employee Performance Appraisal forms). Defendants state in a footnote in their brief in support of summary judgment that "[a]n employee who 'meets standards' receives a one step raise. An employee who 'exceeds standards' receives a two step raise." Doc. no. 15 (defendants' substituted brief in support of motion for summary judgment), at 7 n.1. Defendants do not provide any citing reference to support this proposition.

[28]Shannon Deposition, at 54, 55.

[29]*Id.* at 56.

[30]*Id.* at 57.

[31]*Id.* at 58.

In December of 1999, following plaintiff's reinstatement, she received a "pre-appraisal evaluation" covering the time period from April 24, 1999 (the date of reinstatement) to June 1, 2000. During a pre-appraisal evaluation, the employee and her supervisor discuss the employee's job responsibilities and the performance rating the employee will receive for the upcoming rating period.[32] Plaintiff also received a "mid-appraisal evaluation" on February 17, 2000. During a mid-appraisal evaluation, the employee and supervisor review the employee's job performance since the employee's pre-appraisal evaluation, discuss the employee's strengths and weaknesses, and determine how the employee's performance can improve before her final evaluation.[33] On plaintiff's February 17, 2000 mid-appraisal evaluation form, her rating supervisor (Sergeant Frederick Langley) wrote:

> Officer Shannon has never worked in a work release facility. Upon her arrival there was much to be learned. Officer Shannon has learned very much and does well at difficult jobs. Officer Shannon has a desire to perform her duties to the best of her ability . . . . There were some problems initially with incorrect AIS #'s, bed #'s, etc. . . . Officer Shannon began rechecking her documentation for errors and her reports are now accurate.[34]

In 2000, plaintiff's supervisor (Sergeant Langley) gave her a PAS score of

---

[32]*Id.* at 58-59.

[33]*Id.* at 59-60.

[34]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 9 (Pre-Appraisal form dated December 23, 1999).

-9-

35.0, or "Exceeds Standards."[35] Captain Bettina Carter reviewed and signed the 2000 rating before plaintiff received it.[36]  As a result of the 2000 evaluation, plaintiff received a two-step pay-increase.[37]  Plaintiff's next mid-appraisal evaluation was conducted on December 5, 2000 by Sergeant Renee Mason.  Sergeant Mason stated on the evaluation form that plaintiff had a problem with showing too much emotion in situations involving inmates.[38]  In 2001, Sergeant Mason again was plaintiff's rating officer and assigned her a PAS score of 34.0, or "Exceeds Standards."[39] Captain Bettina Carter approved the rating.[40]

The final employment appraisal in plaintiff's personnel file is the pre-appraisal evaluation she received for the time period between June 1, 2001 and June 1, 2002.[41] On that form, Sergeant Renee Mason identified many strengths in plaintiff's job performance.  She also identified the following area in which plaintiff needed improvement:  "Officer Shannon needs to learn self control when dealing with inmates.  She allows inmates to provoke her during minor situations causing the

---

[35]Shannon Deposition, at 63.

[36]*Id.* at 63-64.

[37]*Id.* at 64.

[38]*Id.* at 66.

[39]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 12 (Employee Performance Appraisal Form dated 5-17-01).

[40]*Id.*

[41]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 13 (Pre-Appraisal Form).

situation to escalate to major incidents due to her lack of self-control."[42]

Plaintiff disagrees with all of the annual employment evaluations in which she received a PAS score equating to "Meets Standards," and all negative comments made by supervisors in pre-appraisal and mid-appraisal forms. On the other hand, she agrees with all evaluations in which she received a PAS score of "Exceeds Standards," and all positive statements made about her in any pre-appraisal and mid-appraisal form.[43]

## D.    Plaintiff's Disciplinary Record

ADOC follows a progressive disciplinary procedure to correct an employee's behavior. ADOC's Employee Discipline regulations state that, when an employee's performance is lacking, the employee's supervisor may first, "at his/her discretion, in a positive, non-threatening manner, . . . inform the employee of shortcomings, remind the employee of expectations, and how to meet them or may by-pass this step and apply a group sanction."[44] The supervisor next may issue an informal, but written "Supervisory Instruction."  If the employee's problems persist despite informal correction, the supervisor may then issue a formal, written "Warning."  A warning is

---

[42]*Id.*

[43]Shannon Deposition, at 54, 56-58, 60-61, 63, 65, 68-69, 70-72.

[44]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 21 (ADOC Administrative Regulation Number 208 regarding Employee Discipline).

noted on the employee's performance evaluation form, but it does not affect the employee's final Performance Appraisal Score.  The next step in the disciplinary procedure is a "Written Reprimand," which results in a seven-point deduction from the employee's final Performance Appraisal Score, and which may only be imposed by a supervisor holding the rank of Warden or other "Division Head."[45] If the Written Reprimand is not successful in correcting the employee's deficiencies, a supervisor may recommend that the employee be suspended without pay.  A suspension without pay results in a seventeen-point deduction from the employee's Performance Appraisal Score, and may be finally authorized only by the Commissioner of ADOC.

> *Dismissal is the last step in progressive discipline.  This step should be taken only when an employee has failed to correct performance/behavior using the previous disciplinary steps* or when an employee violates a rule of such a nature as to require [ ] dismissal, i.e., positive drug screen.  It should be used when an employee either cannot or will not perform to meet job responsibilities . . . . Only the Commissioner [of the ADOC] through his original signature as the appointing authority is authorized to impose a dismissal.[46]

ADOC employee discipline regulations set forth guidelines for the types of employee misconduct which can lead to each level of discipline.[47]  Even so, "[s]upervisors may

---

[45]ADOC Administrative Regulation Number 208 regarding Employee Discipline, at 10.

[46]ADOC Administrative Regulation Number 208 regarding Employee Discipline, at 2 (emphasis supplied).

[47]ADOC Administrative Regulation Number 208 regarding Employee Discipline, at 4-7.

use discretion in executing all disciplinary action."[48]

### 1.     Verbal reprimands

After plaintiff's reinstatement, Captain Bettina Carter often directed plaintiff to come into her office, where Carter verbally reprimanded plaintiff for a variety of matters that plaintiff described as "trivial."[49] According to Carter, however, whenever she needed to speak with any officer about a matter, she would call the officer into her office to discuss the issue in private.[50] Despite this explanation, plaintiff found Carter's summons to be excessive.  She said that, "if somebody made a complaint on me or just any little old thing that [Carter] could call me in on, she would."[51]

Plaintiff received verbal discipline for conduct such as failing to reprimand an inmate, reprimanding African-American inmates too harshly, generating too many write-ups on African-American inmates, and not performing her job duties.[52]

Plaintiff asserts that the accusations Carter made against her "were always baseless."[53]  She also asserts that, "[a]s time passed, Captain Carter [became] bolder in her accusations against me and in her willingness to discipline me for trivial and

---

[48]*Id.* at 3.

[49]Shannon Deposition, at 106-07; Shannon Affidavit, at ¶¶ 13-16.

[50]Carter Deposition, at 20-23.

[51]Shannon Deposition, at 106.

[52]Shannon Affidavit, at ¶ 13.

[53]*Id.* at ¶ 14.

contrived offenses."[54]

Plaintiff claims that other employees at the Decatur facility were not verbally reprimanded or criticized for engaging in the same misbehavior.[55] Even if that is so, plaintiff failed to point to a single employee who allegedly engaged in the same or similar conduct, but who was not verbally disciplined by Carter for such actions.[56]

Moreover, plaintiff lodged no complaints against Carter, a fact that she excuses by stating that Carter's criticism had not yet begun to have a tangible effect on her ability to perform her job duties. Instead, plaintiff assumed that, because she had been receiving good annual employment evaluations and pay increases, her job was

---

[54]*Id.* at ¶ 20.

[55]*Id.* at ¶¶ 16-17.

[56]Plaintiff does describe one incident as a purported example of the disproportionate verbal discipline she allegedly received, *i.e.,*

> For example, there was one incident involving Officer Matthews, Officer Petty, and Officer Halmark that I reported in a 601 incident form. An inmate approached me and requested that he be put in protective custody because he was threatened by Officers Matthews, Petty and Halmark. The inmate stated that the officers in question had threatened to kill him because he was going to tell on the officers for bringing in liquor, cigarettes, and women. I completed a 601 form and turned it in to Carter. Carter's response was very hostile to me. She told me to put the inmate in question into a holding unit and under psychic evaluation because he was a homosexual.

*Id.* at ¶ 18. Although this incident demonstrates Carter's criticism of plaintiff, plaintiff does not state that any of the other officers did not receive the appropriate reprimand or other discipline for their misconduct. The record does not reveal any other example of another ADOC employee who did not receive verbal discipline.

safe.[57]

## 2.   Supervisory Instruction

The first written discipline plaintiff received was a Supervisory Instruction ("SI") dated September 13, 2000.[58]  She received it for failing to follow the instructions of Captain Carter to properly complete an inmate incident report.[59]  The SI was signed by Sergeant Langley, plaintiff's intermediate supervisor.[60]  Plaintiff states that the incident report was incomplete only because Sergeant Langley failed to review the report and inform her of any changes that needed to be made before the final copy of the report was submitted to Captain Carter.[61]  Plaintiff says that the deprivation of an opportunity to review the report before it was submitted was "contrary to the typical procedure."[62]  Nevertheless, the SI had no immediate effect: during the rating period in which plaintiff received the SI, she was given the greatest pay increase possible.[63]

---

[57]*Id.* at ¶ 19.

[58]*Id.* at ¶ 21. *See also* doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 14 (Supervisory Instruction dated September 13, 2000).

[59]*See* Supervisory Instruction dated September 13, 2000.

[60]*See id.*

[61]Shannon Affidavit, at ¶ 22.

[62]*Id.*

[63]Shannon Deposition, at 77-78.

### 3.    Warning

Seven months after the foregoing Supervisory Instruction, on April 17, 2001,

plaintiff was issued a written "warning" for an incident that had occurred on or about

March 7, 2001.[64]  Plaintiff described the incident as follows:

> Officer Matthews found Inmate Rutledge sitting in the parking lot of
> Decatur Work Release in a vehicle full of women.  It appeared that
> Inmate Rutledge had been drinking.  Officer Matthews ordered the
> inmate out of the vehicle and into the building, whereupon he realized
> in fact that the inmate had been drinking. Inmate Rutledge did not want
> to sit down. I told Officer Matthews that if he would like, I could have
> two of the officers on duty to take the inmate to the city jail for a breathe
> [sic] alcohol test.  Officer Matthews agreed to let me send the inmate
> over for the test.  Officer Smith and Officer White ran the inmate to the
> city jail for the test.  I called Sergeant Dunlap, the "on-call supervisor,"
> and cleared the matter with him.  Sergeant Dunlap agreed that this was
> fine.  The inmate refused to take the breathe [sic] test at the city jail, so
> the officers returned him to the facility. I called Sergeant Dunlap again
> and informed him of the situation.  Sergeant Dunlap then told me to
> have the inmate locked into the holding unit.  When I told Officers
> Smith and White to take Inmate Rutledge to the holding unit, Inmate
> Rutledge began losing his temper.  He started ranting, raving and
> cursing saying that he was going to make officers near him "fuck boys"
> and that he was going to make me his "fuck girl."  These terms were a
> reference to sexual assault and rape which occurs in prison.  I told
> Inmate Rutledge to sit down and shut up.  The inmate jumped up and
> told me "not to tell him nothing" and then proceeded to advance toward
> me in a threatening manner.  When Inmate Rutledge started coming
> towards me in a threatening manner I moved to my desk and picked up
> a flashlight.  I told Inmate Rutledge that if he did not sit down and shut
> up that I would use the flashlight. Then the other officers stepped in and
> restrained the inmate.

---

[64]Shannon Affidavit, at ¶ 23.

-16-

> I called Sergeant Dunlap again and gave him the details of what had occurred. When Warden Carter investigated, the facts were turned upside down. Warden Carter stated that the incident was all my fault. Which she would have had to known [sic] was not true if she spoke to the other officers, and accepted a true account of the incident. The inmate was not even my direct responsibility under ADOC procedure.[65]

Plaintiff asserts that she should not have been issued a warning because she acted reasonably under the circumstances, and was simply defending herself against a potentially violent inmate.[66] Plaintiff nevertheless was disciplined for again failing to properly document the incident, the same type of mistake that had resulted in the previous "Supervisory Instruction." Plaintiff's immediate supervisor recommended that she be issued a "Written Reprimand," but Warden Bettina Carter reduced the discipline to a "Warning."

Plaintiff acknowledges that she recorded the time of the inmate incident incorrectly,[67] but asserts that no other employee ever was disciplined for noting the incorrect time on an incident report. She also asserts that, "normally no one would have been written up" for any of the events that occurred.[68] However, she does not point to any individual who made the same errors, but was not disciplined in a similar manner.

---

[65]*Id.* at ¶¶ 24-25.

[66]*Id.* at ¶ 26.

[67]*Id.* at ¶ 27.

[68]*Id.* at ¶¶ 27-28.

### 4.    Suspension without pay

The following year, on February 5, 2002, plaintiff was suspended for three days without pay for an incident that had occurred during the middle of the previous year: *i.e.*, on June 26, 2001.[69]  During that incident, plaintiff and Sergeant Renee Mason reprimanded an inmate named Ingram for his failure to follow instructions while driving the Decatur facility's van.[70]  Plaintiff described the inmate's reaction as follows:

> Inmate Ingram became loud, and it was obvious that he was becoming very angry. Inmate Ingram then began calling Sgt. Mason and myself liars.  I called down Inmate Ingram about calling Sgt. Mason a liar.  Inmate Ingram's voice became very loud and rash and he began saying that we were setting him up and that he was not going to take it.[71]

The inmate grew more and more confrontational, and plaintiff believed the inmate was going to attack Sergeant Mason.  She stated:

> I observed that Ingram had both of his hands clenched into very tight fists and had slightly raised one up from his side towards the back of Sgt. Mason.  I believed that Ingram was about to assault Sgt. Mason and

---

[69]*Id.* at ¶ 29.  Bettina Carter explained in her deposition that the approximately eight-month delay between the event prompting plaintiff's suspension and the suspension itself resulted because plaintiff was absent on sick leave during part of that period of time, and because the administrative review that must occur prior to suspension takes substantial time to complete.  Carter Deposition, at 43-44.

[70]Shannon Affidavit, at ¶¶ 30-37.  Certain inmates at the Decatur facility are allowed the privilege of driving the facility's van to pick up other inmates at their work sites, but these inmates apparently are only allowed to drive in certain areas of town, and they are given strict instructions about what they may and may not do while using the facility's van.

[71]*Id.* at ¶ 37.

-18-

> placed myself between the two in a defensive stance.  I placed both of
> my hands up at shoulder level and motion [sic] with my hands to back
> up ordering Inmate Ingram back up and out of the . . . office.[72]

To compound matters, plaintiff *believed* that Sergeant Mason was unaware of

Ingram's threatening behavior, because Mason had turned her back to the inmate.[73]

Plaintiff believed that getting the inmate out of the office was the proper course of

action to protect Sergeant Mason, allow plaintiff time to assess the situation, and call

for backup.[74]  Plaintiff warned the inmate that, if he did not cooperate, he would be

locked up.[75]

> Ingram was ranting that he was already locked up and that there
> was nothing else that I could do to him.  I responded that he could be
> locked up in the holding cell. Ingram made a "come on" motion with his
> fingers and told me to come and get him.  I opened the door and ordered
> Ingram into the office to be locked up.  Ingram, with his fist balled,
> lunged towards me. I assumed a defensive position and said loudly that
> I would knock him out.[76]

An inmate named Edwards ultimately assisted plaintiff in removing Ingram

from the area.  Plaintiff reported the incident to Sergeant Mason, who, according to

plaintiff's account, had been unaware of the inmate's threatening behavior.[77]

---

[72]*Id.* at ¶ 40.

[73]*Id.* at ¶¶ 40-41.

[74]*Id.* at ¶ 42.

[75]*Id.* at ¶ 43.

[76]*Id.* at ¶ 44.

[77]*Id.* at ¶¶ 45-46.

The notice of plaintiff's suspension for this incident stated, among other deficiencies noted, that she had failed to comply with regulations requiring her to "exercise courtesy and tact," and to conduct herself in a manner "consistent with the maintenance of proper security and welfare of the institution and of the prisoners under [her] supervision."[78]

Plaintiff's suspension without pay initially was recommended by Warden Hadley, who still was in charge of the Decatur facility on the date of the incident, but

---

[78]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 16 (notice of suspension dated February 5, 2002). This exhibit is one subject of plaintiff's motion to strike. Plaintiff argues that Exhibit 16 should be stricken because it is hearsay, and because it does not fall into the business records exception to the hearsay rule embodied by Federal Rule of Civil Procedure 803(6). *See* doc. no. 27 (motion to strike), at ¶ 1. The court concludes that the document is admissible, because it falls under *the public records exception* to the hearsay rule embodied by Federal Rule of Civil Procedure 803(8). Rule 803(8) excludes the following items from application of the hearsay rule:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . unless the sources of information or other circumstances indicate lack of trustworthiness.

Section 36-26-28 of the Alabama Code provides that a state employee's suspension

> may be effected only by service upon the employee by the appointing authority of written charges setting out clearly the delinquency for which the suspension was made, a copy of which must at the same time be mailed or delivered to the State Personnel Director, and a written notice of the right to appeal the suspension . . . .

Ala. Code § 36-26-28 (1975 and Supp. 2001). The notice of suspension mailed to plaintiff concerned ADOC's activities and was created pursuant to ADOC's duty to provide plaintiff with written notice of her suspension. Thus, the notice of suspension, submitted herein as defendants' Exhibit 16, falls under the public records exception to the hearsay rule. Plaintiff's motion to strike will be denied with respect to defendants' Exhibit 16.

plaintiff contends that Bettina Carter must have approved the suspension because she was promoted to Warden before the suspension actually was imposed on February 5, 2002.[79]  According to Carter, challenging or provoking an inmate as plaintiff did during this incident is dangerous, because it can lead to violence against other officers and inmates.[80]

Plaintiff believes the suspension was improper because she followed established ADOC procedures and did what she was trained to do.  She also contends that it was contrary to general ADOC policy for her to be suspended because she had followed proper procedures.[81]  Plaintiff confronted Bettina Carter about the incident the day after it occurred.  She asked Carter whether she was being disciplined in retaliation for her 1997 lawsuit.  Carter responded that plaintiff should consider taking up truck driving again.[82]

**5.    Termination**

The final incident documented in plaintiff's personnel file occurred on December 6, 2001: *i.e.*, about five months after the June 26th incident leading to plaintiff's suspension without pay.

---

[79]*See* Carter Deposition, at 44; Shannon Affidavit, at ¶ 7.

[80]Carter Deposition, at 44-47.

[81]Shannon Affidavit, at ¶¶ 53-54.

[82]*Id.* at ¶ 52.

On that date, plaintiff was directed to determine whether any of the inmates in the Decatur facility's holding cell were concealing extra mattresses, pillows, or other bedding. Plaintiff conducted a "shake down" of each inmate's bunk.[83] Although the record does not provide a clear definition of what actions constitute a "shake down," the court infers that it is a search of an inmate's belongings. When plaintiff began the shake down for an inmate named Davis, he

> shouted that "this was fucking bull shit" and that he wasn't going to be shook down, and I was not "going to take shit away from him." I gave Davis a direct order to get up. Inmate Davis jumped off his bed and got between me and the door and shouted "I've got two life sentences and I ain't goin' to do shit." Inmate Davis had become hostile and was shouting in my face holding fists to his chest and shaking his fists in a trembling manner. I believed myself to be in immediate danger and took a defensive stance to protect myself. I could not get immediately out of the cell because the entrance was blocked by the inmate.[84]

Plaintiff eventually managed to exit the cell without physical contact and called another officer for assistance. She also reported Davis's behavior to Captain Carter and Sergeant Mason, the supervisors on duty.[85] She subsequently returned to the cell with two other officers, who removed Davis, and plaintiff resumed her search for contraband bedding. Plaintiff states that she only confiscated contraband bedding, as she had been instructed.

---

[83] *Id.* at ¶¶ 56-59.

[84] *Id.* at ¶ 61.

[85] *Id.* at ¶¶ 63-65.

Bettina Carter testified, however, that plaintiff was disciplined for throwing the personal items of Davis (as well as other inmates) onto the floor of the cell.[86] According to Carter, throwing an inmate's personal items on the floor was highly insulting, degrading, and could have resulted in violence.  Carter described the resulting situation as "explosive."[87]  Accordingly, although Carter found plaintiff's job performance generally to be good, she recommended plaintiff's dismissal for the incident.[88]

Plaintiff received a memorandum from Bettina Carter on March 1, 2002, giving her notice of a pre-dismissal conference.[89]  The memorandum stated that plaintiff's

---

[86]Carter Deposition, at 48-49.

[87]*Id.* at 54-55.

[88]*Id.* at 51.

[89]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 17 (memorandum notice of pre-dismissal conference dated March 1, 2002).  This exhibit is one subject of plaintiff's motion to strike.  Plaintiff argues that Exhibit 17 should be stricken because it is hearsay, and it does not fall into the business records exception to the hearsay rule embodied by Federal Rule of Civil Procedure 803(6). *See* doc. no. 27 (motion to strike), at ¶ 2.  The court concludes that the document is admissible, because it falls under *the public records exception* to the hearsay rule embodied by Federal Rule of Civil Procedure 803(8). Rule 803(8) excludes the following items from application of the hearsay rule:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . unless the sources of information or other circumstances indicate lack of trustworthiness.

Section 36-26-27 of the Alabama Code provides that a state employee may be terminated by the appointing authority "for reasons which shall be stated in writing, served on the affected employee and a copy furnished to the director, *which action shall become a public record*." Ala.

conduct during the December 6, 2001 incident violated her duties under ADOC

Administrative Regulation 207 to, among other things, "exercise courtesy and tact"

and conduct herself in a manner "consistent with the maintenance of proper security

and welfare of the institution and of the prisoners under [her] supervision."[90]  The

memorandum also stated that plaintiff had violated ADOC Administrative Regulation

208 with regard to "[s]erious violations of other rules, procedures, laws or reasonable

conduct expectations," and "[v]iolation of security regulations/procedures when the

potential consequences are serious but consequences *do not* actually occur." Finally,

plaintiff was charged with violation of the procedures set forth in ADOC

Administrative Regulation 301 for care of an inmate's personal property during a

shakedown.[91]

Following an administrative review of Carter's recommendation, plaintiff's

employment was terminated by ADOC Commissioner Michael W. Haley on March

22, 2002.[92]  The notice of termination summarized defendants' account of the

---

Code § 36-26-27 (1975) (emphasis supplied).  Thus, the memorandum notice of pre-dismissal conference, submitted herein as defendants' Exhibit 17, falls under the public records exception to the hearsay rule.  Plaintiff's motion to strike will be denied with respect to defendants' Exhibit 17.

[90]Doc. no. 16 (defendants' substituted evidentiary submission) at Exhibit 17 (memorandum notice of pre-dismissal conference dated March 1, 2002), at 1.

[91]*Id.* at 2.

[92]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 18 (notice of dismissal dated March 20, 2002). This exhibit is one subject of plaintiff's motion to strike.  For the reasons stated in footnotes 78 and 89, *supra,* the court concludes Exhibit 18 is subject to the public records exception to the hearsay rule embodied in Federal Rule of Civil Procedure 803(8).  Thus,

December 6, 2001 incident, set forth the administrative regulations violated by plaintiff, detailed her disciplinary history, and ordered dismissal.[93] Plaintiff states that "ADOC always follows the recommendations of the supervising Warden with respect to the termination of a Corrections Officer."[94]

Plaintiff appealed her dismissal to the State of Alabama Personnel Board.[95] Following a hearing at which plaintiff was allowed to present evidence, and upon the recommendation of the Administrative Law Judge conducting the hearing, the Personnel Board affirmed ADOC's decision.[96]

## E.    The Present Action

Plaintiff commenced this suit on November 19, 2002.[97] She originally asserted claims for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff subsequently

---

plaintiff's motion to strike will be denied with respect to defendants' Exhibit 18.

[93]*Id.*

[94]Shannon Affidavit, at ¶ 73.

[95]Shannon Deposition, at 139-40.

[96]Shannon Deposition, at 143. Plaintiff asserts that the transcript of plaintiff's hearing before the ALJ should be stricken from the record in this case, because the findings of the ALJ are not *res judicata*, are not admissible as opinion evidence, are irrelevant, and are hearsay. *See* doc. no. 27 (plaintiff's motion to strike), at ¶ 4. The court concludes that it need not consider the contents of the transcript of plaintiff's administrative hearing in determining that summary judgment should be granted on plaintiff's retaliation claim. Thus, that aspect of plaintiff's motion seeking to strike the administrative transcript will be denied as moot.

[97]*See* doc. no. 1 (complaint).

dropped her sex discrimination claim,[98] however, and only her retaliation claim remains for decision. Plaintiff contends that all of the discipline she received while employed at the Decatur Facility, and especially her termination, was in retaliation for her filing of the 1997 lawsuit against ADOC. She seeks compensatory and punitive damages, costs, and attorney fees.

### III. DISCUSSION

#### A.    Abandonment Of Punitive Damages Claim

Plaintiff abandoned her claim for punitive damages at the summary judgment stage. She offered no response to defendant's well-supported argument that summary judgment should be granted on that claim. Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g., Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.,* 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.,* 802 F.2d 260, 269 (7th Cir. 1986) (holding

---

[98]*See* doc. no. 7 (order granting plaintiff's motion to dismiss her discrimination claim).

that a ground not pressed in opposition to a motion for summary judgment is to be

treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on
> his pleadings to avoid judgment against him." *Ryan v. Int'l Union of
> Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986).
> There is no burden on the district court to distill every potential
> argument that could be made based upon the materials before it on
> summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544,
> 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate
> arguments; grounds alleged in the complaint but not relied upon in
> summary judgment are deemed abandoned . . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some

citations omitted).[99]

## B.    Timeliness

Defendant argues that plaintiff's claims are time-barred because she did not file

her charge of discrimination with the Equal Employment Opportunity Commission

("EEOC") until more than 180 days after the alleged retaliatory acts occurred.[100]

---

[99] *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

[100] *See* doc. no. 16 (defendants' substituted brief in support of motion for summary judgment), at 29-31.

Defendant is correct that an EEOC charge must be filed within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(3)(1); *see also, e.g., Alexander v. Fulton County,* 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."). A plaintiff's failure to file a charge within this 180-day period renders that claim time-barred. *See, e.g., Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S. Ct. 498, 66 L. Ed. 2d 431 (1980); *Everett v. Cobb County School District,* 138 F.3d 1407, 1410 (11th Cir. 1998).

Plaintiff filed her EEOC charge on June 20, 2002.[101] Thus, any employment actions that occurred more than 180 days before that date (*i.e.*, before December 22, 2001) would be time-barred. In her brief, plaintiff argues that the termination of her employment "was the first clearly adverse employment event giving rise to tangible damages, and hence warranting a charge to the EEOC."[102] Indeed, plaintiff's entire suit pivots upon her alleged retaliatory discharge, not the other, less severe, disciplinary actions leading to it. Plaintiff's employment was terminated on March 22, 2002, less than 180 days before she filed her EEOC charge. Thus, her EEOC

---

[101]*See* doc. no. 15 (defendants' substituted evidentiary submission), at Exhibit 1 (EEOC charge).

[102]Doc. no. 25 (plaintiff's brief in opposition to motion for summary judgment), at 34.

charge was timely filed, and her retaliation claim, insofar as it relates to her termination, is not time-barred.

## C.   Plaintiff's Retaliation Claim

### 1.   Direct evidence of retaliatory intent

Plaintiff asserts that the statement uttered by Bettina Carter shortly after her reinstatement in April of 1999 — "you may have gotten your job back but you will not keep it" — constitutes direct evidence of defendants' retaliatory intent.[103] Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g., Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed,

---

[103]Plaintiff does not argue that Carter's comment that plaintiff should go back to truck driving school, or the sergeant's comment that plaintiff was not wanted at the Decatur facility, constitutes direct evidence of retaliatory intent.

proves [the] existence of [a] fact in issue without inference or presumption").

Further, to be considered direct evidence, a statement must:  (1) be uttered by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal a *blatant* discriminatory animus. *See, e.g., Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  Only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible characteristic, will be deemed to constitute direct evidence of retaliation. *See, e.g., Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358-59 (11th Cir. 1999); *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999); *Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990); *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).  Evidence that merely suggests a retaliatory motive, *see Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999), or that is subject to more than one interpretation, *see Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), "does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997).  The key inquiry is whether the evidence demonstrates that the "complained-of employment decision was *motivated* by the decision-maker's [retaliatory attitude]." *Damon*, 196 F.3d at 1358-59 (emphasis in original).[104]

---

[104]In *Merritt v. Dillard Paper Co.*, 120 F.3d 1181 (11th Cir. 1997), the Eleventh Circuit

pointed out that the "quintessential example of direct evidence" in a retaliation case would be a statement like "'Fire Merritt — he gave the most damning deposition testimony.'" *Id.* at 1190. *See also Hamilton v. Montgomery County Board of Education,* 122 F. Supp. 2d 1273, 1288 (M.D. Ala. 2000) (holding that the statement "Hamilton should not be hired because of his pending litigation" was "the equivalent of a smoking gun" in terms of providing direct evidence of retaliatory intent). However, the Eleventh Circuit has consistently held that even less direct expressions of discriminatory or retaliatory intent from a decisionmaker constitute direct evidence, so long as the expressions

> "reflect[] a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea,* 904 F.2d 1549, 1555 (11th Cir. 1990). *See Haynes v. W.C. Caye & Co., Inc.,* 52 F.3d 928, 930 (11th Cir. 1995) (holding that statement questioning whether "sweet little old lady could get tough enough" to do job and statement that "a woman was not competent enough to do this job" constitute direct evidence); *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518 (11th Cir. 1990) (holding that statement that "no woman would be named to a B scheduled job" constitutes direct evidence); *Caban-Wheeler,* 904 F.2d at 1555 (holding that defendants' statement that program needed a black director constitutes direct evidence); *E.E.O.C. v. Alton Packaging Corp.,* 901 F.2d 920, 923 (11th Cir. 1990) (holding that general manager's statement that "if it was his company, he wouldn't hire any black people" and production manager's statement that "you people can't do a ---- thing right" constitute direct evidence); *E.E.O.C. v. Beverage Canners, Inc.,* 897 F.2d 1067, 1068 n.3, 1072 (11th Cir. 1990) (holding that plant manager's constant barrage of racial slurs and statements such as "[t]hose niggers out there will not get anywhere in this company" constitute direct evidence); *Sennello v. Reserve Life Ins. Co.,* 872 F.2d 393, 394, 395 (11th Cir. 1989) (holding that statement that "we can't have women in management" constitutes direct evidence); *Walters v. City of Atlanta,* 803 F.2d 1135, 1141-42 (11th Cir. 1986) (holding that memorandum requesting a new list of candidates because "current register . . . does not include any minority group representation" constitutes direct evidence); *Wilson v. City of Aliceville,* 779 F.2d 631, 633, 636 (11th Cir. 1986) (holding that mayor's statement that "he wasn't gonna let no Federal government make him hire no god-dam nigger" constitutes direct evidence); *Thompkins v. Morris Brown College,* 752 F.2d 558, 561, 563 (11th Cir. 1985) (holding that college president's statement that he saw no reason for a woman to have a second job and statement that males had families and needs that female plaintiff did not constitute direct evidence); *Miles v. M.N.C. Corp.,* 750 F.2d 867, 874, 75 (11th Cir. 1985) (holding that plant manager's statement that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" constitutes direct evidence); *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1553, 1557 (11th Cir. 1983) (holding that supervisor's statement that he would not put woman in washerman position because "every woman in the plant would want to go into the washroom" constitutes direct

-31-

Carter clearly can be considered a decisionmaker with regard to the decision to terminate plaintiff's employment. She recommended the action. Although her recommendation had to be approved by the ADOC Commissioner before it became effective, Carter had substantial input into the decision. Thus, Carter was at least *one* of the key decisionmakers. Even so, the questions of whether Carter's comment specifically related to plaintiff's termination almost three years later, and, whether the comment revealed a blatant retaliatory animus, are issues that are not so clearly resolved.

The analysis of the Sixth Circuit in *Weigel v. Baptist Hospital of East Tennessee,* 302 F.3d 367, 382 (6th Cir. 2002), is instructive in determining whether Carter's comment should be considered direct evidence. In that case, the plaintiff voluntarily resigned employment with Baptist Hospital of East Tennessee ("BHET"). In the process of doing so, she made detailed comments, both positive and negative, on an exit questionnaire. *Id.* at 373. Many of the plaintiff's negative remarks related to actions that plaintiff perceived as age discrimination. When she later reapplied for a position with BHET, her application was rejected. *Id.* at 373-74. She filed suit,

---

evidence); *but see Harris,* 99 F.3d at 1082, 1083 n.2 (holding that statement that "*under the circumstances* we did not need to employ a black at Thompson High School" open to more than one interpretation and thus not direct evidence) (emphasis added).

*Merritt,* 120 F.3d at 1189-90.

alleging, among other things, that BHET had retaliated against her for complaining about age discrimination on her exit questionnaire.  Two BHET decisionmakers filed affidavits admitting that they *had* considered "the *nature* of [plaintiff's] comments on the exit questionnaire" as a reason for their decision not to rehire her.  *Id.* at 383 (emphasis supplied).  The Sixth Circuit held, nevertheless, that the decisionmakers' admissions did not constitute direct evidence of retaliation, because many of the plaintiff's comments on the questionnaire did not relate to impermissible discrimination.

> Neither [of the two decisionmakers] singled out [plainitff's] age discrimination complaints in the questionnaire as a specific factor weighing in their decision not to hire her.  Therefore, a fact finder is left to infer that they were referring to [plaintiff's] age discrimination charges, rather than her overall dissatisfaction with BHET.  The fact that [plaintiff] was dissatisfied with nearly every aspect of her employment at BHET is certainly a legitimate reason not to ask her to return.  *In the absence of evidence showing that Herrin and Bowers were referring specifically to [plaintiff's] age discrimination complaints*, we do not find their statements to be direct evidence of retaliatory motive.

*Id.* at 382 (emphasis supplied).

Similarly, Bettina Carter's statement in this case — "you may have gotten your job back but you will not keep it" — does not prove the existence of a fact in issue (a blatant retaliatory attitude) without the need to engage in an inferential leap between fact and conclusion.  Although Carter's statement referenced plaintiff's

reinstatement, it did not single out her 1997 lawsuit as a specific factor affecting

plaintiff's ability to retain her position. Unquestionably, *one* inference that could be

drawn from Carter's statement is that she intended to ensure that plaintiff would not

keep her job *because* Carter *was* angry about plaintiff's 1997 lawsuit. Even so, it is

equally as plausible that Carter was: *e.g.*, expressing her personal dislike for plaintiff;

or opining that plaintiff would not perform her job duties competently. Because

Carter's statement may be interpreted as being *either* retaliatory *or* non-

discriminatory, and also because no specific reference was made to plaintiff's 1997

lawsuit, this court finds that the statement does not constitute direct evidence of a

retaliatory intent. *Cf. Kent v. City of Homestead,* No. 00-3601-CIV, 2002 WL

732109, at *8 (S.D. Fla. March 14, 2002) (decisionmaker's statement that plaintiff

was not a "team player" did not constitute direct evidence of retaliation because it

could be construed as evidence of a non-retaliatory motive).

The Eleventh Circuit's decision in *Scott v. Suncoast Beverage Sales*, 295 F.3d

1223 (11th Cir. 2002), further supports the conclusion that Carter's comment does not

qualify as direct evidence of discrimination. In *Scott*, the plaintiff argued that his

future supervisor's comment, "We'll burn his black ass," was direct evidence of

discrimination. *Id.* at 1227. The Eleventh Circuit disagreed, reasoning that the

"statement does not rise to that level, *because it was made approximately two and*

*one-half years before the termination*, and because it was not directly related to the

subject of [plaintiff's] termination." *Id.* at 1228 (emphasis supplied).   Similarly,

Carter made her comment almost three years before plaintiff's termination, requiring

the court to *infer* that what Carter uttered in 1999 evidenced her retaliatory intent in

2002.

> ## 2.   Circumstantial evidence of retaliatory intent: plaintiff's *prima facie* case

Of course, Bettina Carter's statement still may be considered circumstantial

evidence of a retaliatory intent. *See, e.g., Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266

(11th Cir. 1999) (stating that, while a statement which merely suggests a

discriminatory motive cannot be considered direct evidence, "it is by definition only

circumstantial evidence"); *Harris v. Shelby County Bd. of Education,* 99 F.3d 1078,

1083 n.2 (11th Cir. 1996) (statements with more than one possible meaning constitute

circumstantial evidence).   A Title VII retaliation claim can be proven by either direct

or circumstantial evidence. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S.

792, 796 & n.4, 93 S. Ct. 1817, 1821 & n.4, 36 L. Ed. 2d 668 (1973);[105] *Merritt v.*

*Dillard Paper Co.,* 120 F.3d 1181, 1189-91 (11th Cir. 1997); *Kent v. City of*

---

[105]The plaintiff in *McDonnell Douglas* alleged, among other matters, that the defendant had refused to re-employ him in retaliation for his participation in a so-called "stall-in" and "lock-in," activities protected by the opposition clause of 42 U.S.C. § 2000e-3(a). *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 796 & n.4, 93 S. Ct. 1817, 1821 & n.4, 36 L. Ed. 2d 668 (1973).

*Homestead,* No. 00-3601-CIV, 2002 WL 732109, at *8 (S.D. Fla. March 14, 2002).

Three elements must be satisfied in order to establish a *prima facie* retaliation claim under the familiar *McDonnell Douglas* burden-shifting, analytical framework: (1) plaintiff engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.,* 292 F.3d 712, 715 (11th Cir. 2002); *Bass v. Board of County Commissioners,* 256 F.3d 1095, 1117 (11th Cir. 2001); *Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 507 (11th Cir. 2000). Defendants concede the first two elements. The only disputed issue is whether plaintiff can demonstrate a causal linkage between her 1997 suit and her subsequent termination.

Defendants point out that plaintiff was reinstated in April 1999, but she received no written discipline until September of 2000, approximately fifteen months later.[106] Further, she was not suspended without pay until approximately thirty-four months after reinstatement, and her termination did not occur until thirty-five months after her return to employment. Thus, defendants argue that plaintiff's termination

---

[106]Doc. no. 15 (defendants' substituted brief in support of motion for summary judgment), at 21-22.

was too remote from her 1997 suit and subsequent reinstatement to establish a causal connection.

The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of evidence at trial. At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)).

"[A] close temporal proximity between two events *may* support a finding of a causal connection between those two events." *Wascura v. City of South Miami*, 257 F.3d 1238, 1244-45 (11th Cir. 2001) (emphasis supplied) (citing *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (stating "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection")).

As the Supreme Court has observed, however, the temporal gap between events must be "very close." *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and also citing

-37-

*Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (7th Cir. 1992), for the proposition that three-month and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[107]

Temporal gaps of fifteen to twenty months, standing alone, are insufficient to establish causation. *See, e.g., Breeden*, 532 U.S. at 273, 121 S. Ct. at 1511 (holding that twenty-month gap "suggests, by itself, no causality at all"); *Maniccia v. Brown*, 171 F.3d 1364 (11th Cir. 1999) (holding that gaps of fifteen and twenty-one months between the employee's and employer's respective actions were too great to support a causal nexus); *see also, e.g., Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 n.4 (11th Cir. 2001) (opining that a two-year break between the plaintiff's grievance and the employer's adverse action "probably would prevent a court from finding a

---

[107]In full text, the Supreme Court's statement in *Breeden* is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001) (per curiam).

causal nexus").

Even shorter delays of three to four months have been held to be insufficient evidence of causation. *See Wascura*, 257 F.3d at 1248 ("In light of the other evidence in the record, the three and one-half month temporal proximity is insufficient to create a jury issue on causation."); *Conner v. Schnuck Markets*, 121 F.3d 1390, 1395 (10th Cir. 1997) (four-month gap was insufficient); *Hughes*, 967 F.2d at 1174-75 (four-month gap was insufficient).

Accordingly, the fifteen-month gap between plaintiff's reinstatement and the beginning of disciplinary sanctions is too great for plaintiff to establish causation solely on the basis of temporal proximity.

That conclusion does not end the analysis, however, because temporal proximity is not the *only* means of establishing causation. *See Breeden*, 532 U.S. at 273, 121 S. Ct. at 1511 (twenty month gap "suggests, *by itself*, no causality at all") (emphasis supplied); *Robertson v. Jefferson County Rehabilitation and Health Center*, 201 F. Supp. 2d 1172, 1179 (N.D. Ala. 2002) ("[T]he Eleventh Circuit has indicated that a substantial delay between the protected activity and the adverse action *and the absence of other evidence tending to show causation* may justify judgment as a matter of law for the employer.") (emphasis supplied).

Plaintiff has presented other evidence of defendants' retaliatory motive. First,

of course, defendants obviously were aware of plaintiff's protected activity. *See, e.g., Gupta v. Florida Board of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)); *Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."). Defendants' assertion to the contrary[108] is implausible and does not merit discussion.

Moreover, as observed at the beginning of this section of the discussion, even though Bettina Carter's statement cannot be classified as direct evidence, it does constitute circumstantial evidence of a retaliatory intent. At the very least, Carter's utterance demonstrates "that the protected activity and the negative employment action are not completely unrelated." *Meeks*, 15 F.3d at 1021 (quoting *Reichhold Chemical*, 988 F.2d at 1571-72).[109] Thus, plaintiff has satisfied all elements of a

---

[108]*See* doc. no. 15 (defendants' substituted brief in support of motion for summary judgment), at 23.

[109]Defendants assert that they have affirmative evidence that Carter did *not* intend to retaliate against plaintiff. For instance, defendants assert that Carter would not have given plaintiff good employment evaluations, reduced plaintiff's written reprimand to a warning, or waited fifteen months to impose any disciplinary action, if she harbored a blatant intent to retaliate against plaintiff. This evidence does suggest a non-retaliatory motive on Carter's part, but it conflicts with the evidence presented by plaintiff, especially Carter's statement that plaintiff would not keep her job.

*prima facie* case, and the burden shifts to defendants to articulate a legitimate, non-discriminatory reason for the challenged employment decisions. *See, e.g., St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506-07, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993); *Walker v. Mortham,* 158 F.3d 1177, 1183 n. 10 (11th Cir. 1998).

### 3.     Defendants' legitimate, nondiscriminatory reasons

According to defendants, "[e]ach of the employment actions taken against [plaintiff] were taken to correct, in a progressive fashion, her [non-]compliance with departmental regulations."[110]   Continued violation of workplace rules certainly is a legitimate reason for disciplining, or even terminating, an employee. *See Schoenfeld,* 168 F.3d at 1269; *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir. 1989). Defendants thus have articulated legitimate, non-discriminatory reasons for the adverse employment actions taken against plaintiff, and the presumption of retaliation established by plaintiff's *prima facie* case is rebutted.[111]   Plaintiff now must be

---

At this summary judgment stage, the court must not weigh the conflicting evidence, but must instead construe all evidence in the light most favorable to plaintiff.

[110]Doc. no. 15 (defendants' substituted brief in support of motion for summary judgment), at 26.

[111]Plaintiff argues that defendants have failed to satisfy their burden of producing a legitimate, non-discriminatory reason for the adverse employment actions taken against her because they have not produced any admissible evidence of those reasons. *See* doc. no. 25 (plaintiff's brief in opposition to motion for summary judgment), at 29-31.   It is true that all legitimate, non-discriminatory reasons must be supported by *admissible* evidence. *See Burdine,* 405 U.S. at 255 n.9, 101 S. Ct. at 1094 n.9. Contrary to plaintiff's assertion, however, the record does contain admissible evidence of each step in plaintiff's disciplinary record.   The court already has held that the written documentation of plaintiff's suspension, plaintiff's pre-dismissal memorandum, and plaintiff's

afforded the opportunity to "come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Planters*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095, 67 L. Ed. 2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 1825, 36 L. Ed. 2d 668 (1973)).

### 4.    Pretext

Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).  Plaintiff must show both that defendants' proffered reasons were *not* the true reasons for her termination, and that retaliation *was*. *Hicks,* 509 U.S. at 507-08, 113 S. Ct. at 2747-

dismissal memorandum all are admissible and should not be stricken from the record. *See* notes 78, 89, and 92, *supra.* Evidence of plaintiff's Supervisory Instruction and Written Warning also are in the record, uncontested by plaintiff.  *See* doc. no. 16 (defendants' substituted evidentiary submission), at Exhibits 14 and 15.  Further, plaintiff herself testified in her deposition that she received each level of discipline. *See* Shannon Deposition, at 79, 82, 107, 133.

48.     Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).

Plaintiff argues that the following factors demonstrate that defendants' proffered reasons are a mere pretext for unlawful retaliation: *i.e.,* (1) Carter's statement that plaintiff would not keep her job; (2) plaintiff's positive performance reviews for the time period preceding her termination; (3) the fact that plaintiff received a merit pay increase shortly before her termination; (4) the fact that ADOC misconstrued the facts of the incidents giving rise to plaintiff's discipline; and (5) the fact that the disciplinary action taken against plaintiff was contrary to ADOC's prior practice in similar circumstances, contrary to plaintiff's training, and contrary to plaintiff's prior experience with ADOC's procedures.[112]

Plaintiff's arguments are not sufficient to establish pretext. Some courts have held that a plaintiff's receipt of positive performance reviews or merit pay increases shortly before being terminated or otherwise disciplined can establish pretext *when*

---

[112]Doc. no. 25 (plaintiff's brief in opposition to motion for summary judgment), at 31-32.

the defendant's proffered legitimate reason for the employment decision is a deficiency in the plaintiff's performance.   See, e.g., Cicero v. Borg-Warner Automotive, Inc., 280 F.3d 579, 589-92 (6th Cir. 2002); Logan v. Denny's, Inc., 259 F.3d 558, 575 (6th Cir. 2001); Fisher v. Pharmacia & Upjohn, 225 F.3d 915, 921-22 (8th Cir. 2000).

Here, however, defendants' stated reason for terminating plaintiff's employment was not a deficiency in plaintiff's job performance as such, but repeated and progressively more serious violations of departmental regulations addressing the manner for dealing with inmates.  Because no disciplinary action less than a written reprimand may result in the reduction of an employee's Performance Appraisal Score, plaintiff's disciplinary record would not have affected her annual performance appraisals until February 5, 2002, when she was suspended without pay.  All of plaintiff's Performance Appraisal Scores in the record presented to this court, however, are dated before plaintiff's suspension without pay.  Further, because an employee's ability to receive merit pay increases depends on the employee's PAS score, plaintiff's disciplinary record also would not have affected her ability to receive pay increases.  Thus, plaintiff's positive performance appraisals and pay increases are unrelated to defendants' proffered reason for the disciplinary sanctions imposed upon plaintiff, and they cannot be used to establish that the proffered reason

is a pretext for retaliation.

Further, plaintiff's assertion that ADOC misconstrued the facts of the incidents giving rise to plaintiff's discipline is unavailing, even if it is true. It is well settled that a federal court should not determine "'whether employment decisions are prudent or fair. Instead, [the court's] sole concern is whether an unlawful discriminatory animus motivates a challenged employment decision.'" *Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002) (quoting *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999)). Thus, the court is not "interested in whether the conclusion is a correct one, but whether it is an honest one." *Rojas,* 285 F.3d at 1342. It is no surprise that plaintiff disagrees with defendants' version of the events leading up to her discipline and ultimate termination. However, plaintiff has failed to present any evidence that defendants did not honestly believe the disciplinary events occurred in the manner defendants described them.

Finally, plaintiff offers no evidence to support her conclusory assertion that the disciplinary actions taken against her were contrary to ADOC's prior practice in similar circumstances, contrary to her training, or contrary to her prior experience with ADOC's procedures. She has pointed to no other employee who did not receive equal discipline for similar infractions; she does not describe how the discipline she received differed from her training; and she does not explain how ADOC followed

-45-

different procedures in past situations. Plaintiff's conclusory allegations of ADOC's departure from procedure and customary practice are insufficient to establish pretext. *See Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 597 (11th Cir. 1987).

Carter's comment that plaintiff would not keep her job is the one fact that most arguably demonstrates pretext. Even so, the comment, by itself, is insufficient. The Eleventh Circuit has strongly suggested that discriminatory or retaliatory comments, *standing alone*, cannot establish pretext.

In *Beaver v. Rayonier, Inc.*, 200 F.3d 723 (11th Cir. 1999), the plaintiff asserted that his employer discriminated against him on the basis of his age by denying him a vacant position for which he was qualified and for which he applied. *Id.* at 729. He presented evidence that the relevant decisionmaker "had expressed a desire to attract 'younger, engineer-type employees or supervisors.'" *Id.* The court stated that the decisionmaker's comments did not constitute direct evidence, "and would not be enough *standing alone* to show a discriminatory motive." *Id.* at 730 (emphasis supplied). The court also emphasized, "we do not hold that [the decisionmaker's] comment, *taken alone*, is enough to present a jury question on the issue of discriminatory intent." *Id.* (emphasis supplied). Only when the comment was considered in conjunction with other evidence could a discriminatory motive be

-46-

inferred. *Id.*

This conclusion is further supported by the fact that the court could find *no* decision of the Eleventh Circuit where a plaintiff actually proved a discriminatory or retaliatory motive on the part of a decisionmaker solely on the basis of a single comment by that decisionmaker. Indeed, in each case in which the Eleventh Circuit has relied on a decisionmaker's comments as circumstantial evidence of a discriminatory or retaliatory intent, additional evidence also has been present. *See, e.g., Schoenfeld,* 168 F.3d at 1270-71 (circumstantial evidence of decisionmaker's discriminatory comments, "*combined with the other evidence advanced to raise a prima facie case of discrimination,*" was sufficient to show pretext) (emphasis supplied); *accord Dorrego v. Public Health Trust of Miami Dade County,* 293 F. Supp. 2d 1274, 1283-84 (S.D. Fla. 2003) (stating that, "under the circumstantial evidence standard, without additional persuasive evidence of pretext, a derogatory remark, standing alone, is insufficient to create an issue of fact on pretext") (citations omitted).

However, the Eleventh Circuit may not have foreclosed the possibility that a discriminatory or retaliatory comment, standing alone, may establish pretext in exceptional cases. In *Scott v. Suncoast Beverage Sales*, 295 F.3d 1223 (11th Cir. 2002), the Eleventh Circuit stated that, "although a comment unrelated to a

-47-

termination decision[113] may *contribute* to a circumstantial case for pretext, it will *usually* not be sufficient absent some additional evidence supporting a finding of pretext." *Id.* at 1229 ("contribute" emphasized in original; emphasis added to "usually") (citations omitted). The use of the adverb "usually" suggests that there may be a narrow exception to the general rule.

The Eleventh Circuit has given guidance on how to weigh the probative value of employer comments which may evidence a discriminatory intent. In *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354 (11th Cir. 1999), the court addressed an employer's comment on the basis of its "substance, context, and [the] timing of [the] comment." *Id.* at 1362. In *Rojas v. State of Florida*, 285 F.3d 1339 (11th Cir. 2002), the Eleventh Circuit stated that "evidence relating to [a supervisor's] discriminatory comments had to be 'read in conjunction with the entire record' and 'considered together with' the other evidence in the case." *Id.* at 1343 (citations omitted).

Here, upon review of the substance, context, and timing of Carter's comment,

---

[113]Arguably, the present case presents a comment *related* to a termination decision ("you may have gotten your job back but you will not keep it"), rather than a comment *unrelated* to a termination decision, as in *Scott*. This is not a meaningful distinction for present analysis. The court cites *Scott* for the proposition that, in exceptional cases, the Eleventh Circuit may find pretext solely on the basis of evidence of an employer's comment, even if it is unrelated to a termination decision. If so, a comment related to a termination decision (and therefore more probative of discriminatory intent) could certainly show pretext under exceptional circumstances.

plaintiff fails to demonstrate pretext. In plaintiff's favor, the substance of Carter's comment ("you may have gotten your job back but you will not keep it") demonstrates that Carter, at the very least, resented plaintiff or her reinstatement. However, one cannot necessarily conclude from the comment that Carter intended to retaliate against plaintiff. As discussed earlier, Carter's comment leaves open the possibility that she simply disliked plaintiff for nondiscriminatory reasons, or predicted that plaintiff would not properly perform her duties.

More importantly, the temporal gap between Carter's comment and plaintiff's termination diminishes the causal connection between the statement and plaintiff's conclusion that her employer retaliated against her. Carter made her comment "upon [plaintiff's] reinstatement" at the Decatur facility,[114] on or near April 24, 1999.[115] ADOC did not terminate plaintiff until March 22, 2002, nearly *three years* later. Eleventh Circuit precedent helps put this temporal gap into perspective. In *Damon*, the court found that a supervisor's statement that he wanted "aggressive, young men" was probative as to whether age animus motivated the decision to terminate plaintiff because the remark (1) was allegedly made only *three months* after the plaintiff's termination and (2) *immediately followed* the termination of someone similarly

---

[114]Shannon Affidavit, at ¶ 8.

[115]Shannon Affidavit, at ¶¶ 4-5.

situated to plaintiff and in the same protected class. 196 F.3d at 1263.

Plaintiff may respond that there was a time lapse in this case only because her employer implemented a progressive disciplinary procedure, pursuant to which ADOC first had to issue an informal written Supervisory Instruction, then a formal written Warning, then a suspension before it could proceed to termination. This argument would have more force if Carter herself had initiated the intermediate steps leading to plaintiff's dismissal. Instead, while Carter verbally reprimanded plaintiff soon after her reinstatement,[116] Sergeant Langley issued plaintiff's first Supervisory Instruction on September 13, 2000,[117] Sergeant Mason issued a warning on April 11, 2001,[118] and Warden Hadley recommended plaintiff's suspension without pay on February 5, 2002, although plaintiff contends that Carter must have approved the suspension.[119] Nevertheless, it was not until March 1, 2002 that Carter herself issued a notice of pre-dismissal conference to plaintiff.[120]  There is thus little, if any, intermediate evidence linking Carter's comment in 1999 to plaintiff's actual dismissal

---

[116]Shannon Deposition, at ¶¶ 13-16.

[117]Doc. no. 16 (defendant's substituted evidentiary submission), at Exhibit 14 (Supervisory Instruction, signed 9/13/2000).

[118]Doc. no. 16 (defendant's substituted evidentiary submission), at Exhibit 15 (Warning, signed 4/17/2001).

[119]Doc. no. 16 (defendant's substituted evidentiary submission), at Exhibit 16 (Suspension Letter, dated 2/05/2002); Shannon Affidavit, at ¶ 7.

[120]Doc. no. 16 (defendant's substituted evidentiary submission), at Exhibit 17 (Memorandum, dated 03/01/2002).

in 2002.

Carter's comment also appears to be an isolated one in the context of the entire record.  Plaintiff testified that soon after her reinstatement an *unidentified* "officer" told her, "We didn't want you here in the first place . . . you didn't come over here the way you should have, and it's all because of that damn lawsuit that you had."[121] While this comment demonstrates some of the hostility that plaintiff faced upon reinstatement, it has little probative value because it has not been established as an utterance by a person with decisionmaking authority over plaintiff's employment, and it too lacked temporal proximity to plaintiff's termination.  Plaintiff also confronted Carter in 2002 after an incident leading to her suspension, and asked whether she was being disciplined in retaliation for bringing the 1997 lawsuit.  According to plaintiff, Carter responded that plaintiff should consider taking up truck driving again.  During that conversation, Carter never explicitly addressed the assertion implicit in plaintiff's question; that her suspension was retaliatory.[122] Carter's silence is evidence, but not strong evidence, of a retaliatory intent, and the court cannot impute much meaning to Carter's ambiguous comment that plaintiff should consider taking up truck driving again.

---

[121]Shannon Deposition, at 101.

[122]Shannon Affidavit, at ¶ 52.

The probative value of Carter's comment is further diminished by the fact that Commissioner Haley, and not Carter, made the final decision to discharge plaintiff. While Carter recommended plaintiff's termination, ADOC's employee disciplinary policy specifies that "only the Commissioner through his original signature as the appointing authority is authorized to impose a dismissal."[123] The policy further states that "where dismissal is recommended, the Commissioner may approve the dismissal, specify that no action is to be taken, or approve lesser discipline such as a suspension in which case a hearing would be required."[124]

Plaintiff attempts to minimize the significance of Commissioner Haley's review by arguing that "ADOC always follows the recommendations of the supervising Warden with respect to the termination of a Corrections Officer."[125]   However, plaintiff failed to substantiate her argument when pressed to do so at her deposition, where she had the following exchange with defendants' counsel:

[Q]:  Do you believe Commissioner Haley retaliated against you for filing your previous lawsuit?

[A]:  Yes, sir.

---

[123]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 21 (Administrative Regulation No. 208), provision II(B)(7).

[124]Doc. no. 16 (defendants' substituted evidentiary submission), at Exhibit 21 (Administrative Regulation No. 208), provision III(G)(6).

[125]Doc. no. 22 (Shannon affidavit), at ¶ 73.

[Q]:  What do you base that on?

[A]:  Because the department upholds what their captains, wardens and all of that [sic] do.

   . . . .

[Q]:  Do you have any evidence or proof that what you're saying is in fact true, or is that just a belief that you have?

[A]:  I would say by my own experience and knowing other officers, you don't win cases with the Department of Corrections on any given write-ups.[126]

Here, there is insufficient evidence to determine whether Commissioner Haley adopted, without independent consideration, Warden Carter's recommendation to terminate plaintiff.  The evidence thus falls short of being determinative on the issue of whether defendants unlawfully retaliated against plaintiff.[127]  Carter may have expressed retaliatory intent in 1999, but the passage of nearly three years, and Commissioner Haley's review, puts into serious question the probative value of that

---

[126]This passage appears on pages 136 and 137 in the Shannon Deposition (doc. no. 16, defendants' substituted evidentiary submission, at Exhibit 1).  The court had to obtain page 137 directly from Bain & Associates Court Reporting Services, Inc., the company that reported and transcribed the deposition, because defendants' evidentiary submission omitted pages 137 and 138. The court assumes that this was an inadvertent omission, and has informally included the missing pages as doc. no. "23A," in Volume 2 of the case file.

[127]*See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."); *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1324 n.14 (11th Cir. 1998) ("Depending upon the circumstances of a case, evidence of discriminatory intent of persons other than the final decisionmaker may be important in some employment discrimination litigation.").

comment.

Carter's statement thus represents an isolated comment, without temporal proximity, subject to more than one meaning, buffered by a final decisionmaker's review. The Eleventh Circuit may not wish to foreclose the possibility that a single comment, standing alone, may be sufficient to demonstrate pretext, but this court cannot conclude that the substance, context, and timing of Carter's comment warrants such an exception in this case.

In sum, plaintiff cannot rely solely on Carter's comment to establish pretext. Because plaintiff has offered no other sufficient evidence to support a finding that defendants' proffered, legitimate, non-retaliatory reasons are a mere pretext for retaliation, summary judgment will be granted on plaintiff's retaliation claim.

## IV. CONCLUSION

In accordance with the foregoing, defendants' motion for summary judgment will be granted. Plaintiff's retaliation claim will be dismissed with prejudice. Plaintiff's motion to strike will be denied. An appropriate order will be entered contemporaneously herewith.[128]

---

[128]Because summary judgment is due to be granted on plaintiff's substantive retaliation claim, the court need not address defendants' arguments that punitive damages are not available against a governmental entity; that certain aspects of plaintiff's claim are untimely; and that the same employment decisions would have been made even without a retaliatory motive.

-54-

DONE this _15th_ day of October, 2004.

_____
United States District Judge